IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BUTTE DIVISION

| | |
|---|---|
| ROBERT PETERICH,<br><br>Plaintiff,<br><br>vs.<br><br>DR. MCGREE, SGT. LACI WILLIAMS, and CAPTAIN MARK JOHNSON,<br><br>Defendants. | CV 15-65-BU-BMM-JCL<br><br><br>FINDINGS AND RECOMMENDATIONS OF UNITED STATES MAGISTRATE JUDGE |

Plaintiff Robert Peterich, a state prisoner appearing pro se, has alleged violations of his civil rights under 42 U.S.C. § 1983 pursuant to the Eighth Amendment Cruel and Unusual Punishment Clause and the Fourteenth Amendment Equal Protection Clause. (Doc. 1.) Currently pending are Defendants' Motions for Summary Judgment. (Doc. 66, 74.)

Peterich was properly advised by notices filed by Defendants on September 26, 2016 and September 27, 2016 (Docs. 73, 77) of the requirements for opposing motions brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. *See Rand v. Rowland*, 154 F.3d 952, 957 (9th Cir. 1998)(en banc); *Klingele v. Eikenberry*, 849 F.2d 409 (9th Cir. 1988). On October 11, 2016, he filed a "Motion to Dismiss Deposition and Summary Judgement [sic]" and supporting brief, which the Court construed as a response to Defendants' motions for

1

summary judgment.  (Doc. 78.)  Peterich did not file a Statement of Disputed Facts as required by Local Rule 56.1(b).  He seeks to be excused from this requirement asserting he was unable to dispute the facts in Defendants' motions for summary judgment because he was being transferred between facilities for a federal proceeding and as such did not have access to his property, materials, or a law library.  (Doc. 78-1.)[1]  Even assuming Peterich's assertion is true and excusing him for not complying with L.R. 56.1(b), nothing prevented him from filing a response supported by affidavit disputing the Defendants' factual assertions submitted in support of their motions for summary judgment.

For the reasons set forth herein, the Court finds that Peterich failed to present a genuine issue of material fact regarding whether Defendants violated his constitutional rights.  In light of the finding that there was no constitutional violation, the Court need not address Defendants' qualified immunity and failure to exhaust administrative remedies defenses.  Summary judgment should be granted.

## II. Statement of the Case

### A. Allegations

In his Complaint, Peterich named as defendants Dr. McGree, a physician

---

[1] In their Reply, Defendants Williams and Johnson submit that Peterich was housed at the Missoula County Detention Facility from the time they filed their motion for summary judgment until after his response was due.  (Doc. 79 at 2.)  This statement by counsel, however, is unsupported by any evidentiary material of record.

who provided medical care to inmates at the Butte Silver Bow County Detention Center (BSBDC); Mark Johnson, the Chief Detention Officer at BSBDC; and Lacie Williams, a non-shift sergeant at BSBDC. (Doc. 69, ¶ 3; Doc. 70, ¶ 2; Doc. 71, ¶ 2.) He alleges he has diverticulitis, is lactose intolerant, and was supposed to be on a soft diet, with regular fiber, and no seeds. Peterich claims that while he was incarcerated at BSBDC, Defendants failed to provide him with a diet consistent with his dietary needs and denied him proper treatment for diverticulitis and a hernia. He requests injunctive relief in the form of surgery for his hernia, treatment for pain, a change in diet, and monetary damages of $100,000 for his pain and suffering. (Doc. 1.) Since Peterich is no longer incarcerated at BSBDC, his claims for injunctive relief are moot. *See Dilley v. Gunn*, 64 F.3d 1365, 1368 (9th Cir. 1995); *Johnson v. Moore*, 948 F.2d 517, 519 (9th Cir. 1991).

## B. Facts[2]

Peterich was incarcerated in BSBDC on two separate occasions: March 20, 2015 to June 26, 2015 and July 31, 2015, to November 9, 2015. During his first incarceration period at BSBDC, Peterich complained of having diverticulitis. Dr. McGree examined Peterich on May 19, 2015 and discussed Peterich's diverticulitis concerns. According to his medical note for this examination, Dr. McGree

---

[2]The Court has taken the facts in the light most favorable to Peterich. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 255 (1986).

3

believed Peterich to be in good health. (Doc. 69-1.)  In April, Peterich authorized a release of his medical records from a jail where he had previously been incarcerated. (Doc. 68-2.)  Dr. McGree reviewed those medical records and summarized his findings in a medical note dated June 9, 2015.  The medical records showed Peterich did have a case of diverticulitis in December 2013, but was otherwise healthy.  The medical records also stated Peterich had a history of substance abuse and drug seeking behavior. (Doc. 69-2.)

On June 26, 2015, Peterich was released from BSBDC but he was arrested and returned to BSBDC on July 31, 2015. (Doc. 68-3, 71, ¶ 3.)  During his second incarceration period at BSBDC, Peterich sent multiple inmate medical requests.  Of these medical requests, two were answered by Defendant Williams.  In his August 5, 2015 request, Peterich wrote he had lost weight due to receiving chemotherapy for colon cancer, and that he needed more food and a no-milk diet. (Doc. 68-5.)[3] Defendant Williams responded stating that the dietician had to approve dietary changes, the dietician was not in the building, and Peterich's weight would be monitored. (Doc. 68-5.)  Defendant Williams based her response on a response given by a nurse to a similar medical request from Peterich, also dated August 5. (Doc. 70, ¶¶ 4–10.)

---

[3]In his deposition, Peterich admitted he never had chemotherapy and never suffered from colon cancer despite what he represented in his medical requests. (Doc. 68-1 at 62:2 - 25; 117:3-4.)

Defendant Williams responded to a second medical request dated August 7, 2015 in which Peterich again complained he just had chemotherapy and no one would change his diet. Additionally, Peterich stated an intention to bring a federal lawsuit, especially against Defendant Williams. Defendant Williams responded that Peterich had a right to counsel, but she did not appreciate Peterich threatening a lawsuit. She also asked who his doctor was and who had administered his chemotherapy treatment. (Doc. 68-7.) Defendant Williams did not answer any further medical kites from Peterich. (Doc. 70, ¶ 14.)

In two medical kites dated August 14, 2015, Peterich stated he tore his abdominal wall during a bowel movement and needed medical attention. (Doc. 68-9, 68-10.) On August 17, 2015, Kevin Doherty, a registered nurse, examined Peterich. Nurse Doherty "observed a bulge to [Peterich's] right groin area that easily went in and out (in other words, it was easily reducible)." (Doc. 72, ¶ 12.) Nurse Doherty advised Peterich to refrain from exercise that aggravated the hernia, as BSBDC guards informed Nurse Doherty that Peterich worked out "excessively." Nurse Doherty also said he would discuss Peterich's condition with Dr. McGree. (Id.) In a medical request dated August 21, 2015, Peterich stated he was feeling better, but still needed a check up and more fiber and vitamins. (Doc. 68-12.)

On August 20, 2015, Peterich submitted an inmate grievance expressing

5

frustration that his numerous medical requests had gone unanswered, he had not been seen by the doctor, his diet had not been changed, and that he needed surgery for his hernia.  Under the section for requested action, Peterich stated he wanted surgery for his hernia and a diet change.  (Doc. 68-11.)  The grievance was ultimately responded to by Nurse Doherty on August 25 after Nurse Doherty and Dr. McGree discussed Peterich's medical condition.  (Doc. 68-11.)  Dr. McGree summarized the discussion with Nurse Doherty on a medical note stating that Peterich had a small inguinal hernia, but it was not causing him problems.  Dr. McGree wrote that such hernias are not treated or addressed until the hernia is incarcerated; Peterich did not have an incarcerated hernia at the time.  (Doc. 69-4.)[4] Furthermore, the medical note stated, "[Peterich] is exercising a lot, which is really not irritating the hernia, so I think he will be fine."  (*Id.*).  Lastly, Dr. McGree asserted his belief that Peterich did not clinically need a special diet.  (*Id.*).  Based upon this discussion with Dr. McGree, Nurse Doherty responded to Peterich's grievance saying the doctor had reviewed it and no new orders were given.  (Doc. 68-11.)

Peterich sent two additional medical requests on September 12, 2015.  In

_____

[4] Although the medical note says Peterich clinically has an incarcerated hernia, Dr. McGree declared that was a mistake and the note should read Peterich clinically did not have an incarcerated hernia. (Doc. 69, ¶ 16.)

both requests, he stated his intestine was sticking out and causing him pain and he reiterated his request for surgery.  (Doc. 68-15 and 68-16.)  On September 15, 2015, Dr. McGree examined Peterich.  During this examination, Peterich told Dr. McGree about his hernia, abdominal pain, need for a special diet, and potential lawsuit.  Dr. McGree replied that he would try to get a specialist for Peterich and that Peterich should not eat the foods that bother him.  In his medical note for the September 15 examination, Dr. McGree wrote that "[d]espite the legal problems, the jail and the likes, medically speaking [Peterich] is stable.  I have reviewed his notes.  I have examined him, and I do not think that there is any crisis in his health or any crisis brewing for him."  (Doc. 69-6.)  Dr. McGree further wrote he would ask the Department of Corrections ("DOC") for a surgery referral.  (*Id.*)  Dr. McGree did not see Peterich after the September 15 examination.  (Doc. 69, ¶ 21.)

BSBDC staff sent a surgical referral to the DOC regarding Peterich's request for a hernia surgery.  On September 23, 2015, the DOC denied the surgical request. In his comment on denial, DOC Dr. Piranian wrote, "This is a chronic issue and unless he develops problems with recurrent near-incarceration, he may seek treatment after leaving [Missoula Assessment and Sanction Center]."  (Doc. 69-7.)

In a medical request dated September 29, 2015, Peterich asked whether the DOC approved his surgery.  Nurse Doherty informed Peterich that his surgery

request had been denied.  (Doc. 68-17.)  Almost a month later on October 28, 2015, Peterich sent a medical request stating his abdomen had torn further, resulting in extreme pain.  Peterich wanted to see the doctor and to be given medication for his pain. (Doc. 68-18.)  Nurse Doherty examined Peterich the next day but did not observe a protrusion or incarceration of the hernia and Peterich did not appear to be in pain.  Nurse Doherty observed "Peterich was trying to force the hernia out . . . " during the course of the examination, which Nurse Doherty advised Peterich not to do.  (Doc. 72, ¶ 18.)  BSBDC staff again told Nurse Doherty that Peterich was continuing to work out.  Nurse Doherty did not issue any new orders in response to the medical request.  (*Id.*).

On November 3, 2015, Peterich inquired why he had not been seen for his hernia and why his surgery request had been denied by the DOC.  Peterich stated his hernia was getting bigger and no one was helping him.  Nurse Doherty responded that the DOC had not approved his request and this had been explained to him before.  (Doc. 68-19.)

On November 9, 2015, Peterich was transferred to Broadwater County Detention Center.  (Doc. 68, ¶ 70.)  On November 13, 2015, he was transferred to Missoula Assessment and Sanction Center ("MASC").  (*Id.* at ¶ 71.)  Peterich alleges he was sent to Broadwater County Detention Center in retaliation for filing

this lawsuit. (Doc. 47 at 4.) Peterich also alleges the Broadwater County

Detention Center staff "freaked out" when they saw his intestine and

malnourishment, which is why they sent him to MASC so quickly. (*Id.*, Doc. 68-1,

168:13–169:1.) He alleges the MASC doctor saw him and "could not believe

[BSBDC] and Dr. McGree left [him] like that," and so Peterich was seen by a

surgeon immediately and had surgery for his hernia. (Doc. 47 at 4.)

To refute Peterich's allegations, Defendants submitted a health assessment

form completed by MASC staff on November 13, 2015. The health assessment

lists a right inguinal hernia that reduces easily, followed by "just wants us to

know." (Doc. 68-21.)

The next medical report produced by Defendants is dated January 6, 2016,

almost two months after Peterich was transferred to MASC. The report lists a

painful hernia that is "[n]ot going back in. . . . " (Doc. 68-22.) Peterich received

surgery for his hernia on or about February 5, 2016. (Doc. 68-1, 224:20-22.)

## III. Discussion

### A. Applicable Law–Summary Judgment

Federal Rule of Civil Procedure 56(a) entitles a party to summary judgment

"if the movant shows that there is no genuine dispute as to any material fact and

the movant is entitled to judgment as a matter of law." A movant may satisfy this

burden where the documentary evidence produced by the parties permits only one conclusion. *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).  Once the moving party has satisfied his burden, he is entitled to summary judgment if the non-moving party fails to designate by affidavits, depositions, answers to interrogatories, or admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986).

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party, and draws all justifiable inferences in the non-moving party's favor. *Anderson*, 477 U.S. at 255; *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

Additionally, because Peterich is proceeding pro se the Court must construe his documents liberally and give them "the benefit of any doubt" with respect to Defendants' summary judgment motions. *Frost v. Symington*, 197 F.3d 348, 352 (9th Cir. 1999); *see also Erickson v. Pardus,* 551 U.S. 89, 94 (2007).

## B. Deposition

In his response to the motions for summary judgment, Peterich moves to strike his deposition on the grounds that he was under the influence of pain medication and muscle relaxers which clouded his judgment.  He contends he should not have been deposed while under the influence of pain medications.

10

(Doc. 78-1.)  At the beginning of the deposition, Peterich was specifically asked

whether he was on medications and he gave the following responses:

> Q.  Do you have any reason to believe you will be unable to give
> accurate and complete answers today?
> A.  No, sir.
> Q. Are you on any medications today?
> A. Yes.  I'm on tramadol and baclofen for my spine, and the pain that
> I have.
> Q. Are those -- Do those medications affect your ability to give
> accurate and complete answers?
> A. No, sir.  Not that -- Not to my knowledge.  They're -- I'm
> clearheaded.

(Depo., Doc. 68-1 at 4, 14:2-11.)

However, on the deposition errata sheet, Peterich stated that the answer to

counsel's question whether he had any reason to believe he would be unable to

give accurate and complete answers should have been yes instead of no.  He also

corrected his response to counsel's question whether his medications would affect

his ability to give accurate and correct answers to "yes sir, I'm not clear headed

and it clouds my judgment."  (Doc. 68-1 at 38.)

Peterich did not submit a statement of reasons for these corrections as

required by Rule 30(e) of the Federal Rules of Civil Procedure.  In addition, while

he did make seven other minor changes to the deposition on the errata sheet, he did

not indicate that his medications caused him to give any other inaccurate answers

to counsels' questions.  The Court will not strike the entire deposition because

11

Peterich has not stated how his answers were otherwise affected by the medications or that any other incorrect information was given.

## C. Failure to Provide Adequate Medical Care

In his Complaint, Peterich alleges a violation of his Eighth Amendment right to be free from cruel and unusual punishment. However, a claim of failure to provide medical care to a pretrial detainee arises under the due process clause of the Fourteenth Amendment as opposed to the Eighth Amendment which only applies to convicted prisoners. *Gibson v. Cty. of Washoe, Nev.*, 290 F.3d 1175, 1187 (9th Cir. 2002) *overruled on other grounds by Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016) (9th Cir. 2016).

The Court will assume for purposes of this Order that Peterich was a pretrial detainee when he was incarcerated at BSBDC between March 20, 2015 and June 26, 2015. But there is a factual dispute regarding whether Peterich was a pretrial detainee or convicted prisoner when he was incarcerated at BSBDC from July 31, 2015, to November 9, 2015. Peterich argues he was a pretrial detainee on August 14, 2015, the day he sent a medical request stating he had torn his abdominal wall, and on August 17, 2015, the day Nurse Doherty examined him and observed a potential hernia. (Doc. 47 at 3, 5.) Defendants argue Peterich was a convicted prisoner beginning with his July 31, 2015 arrest since Peterich was arrested for

12

violating his probation.  (Doc. 68-3; Doc. 71, ¶ 8.)  At the very least, Peterich was a convicted and sentenced prisoner, thus subject to the Eighth Amendment, on August 26, 2015, when he was sentenced to the DOC for a term of five years. (Doc. 68, ¶ 48.)  For purposes of the motions at issue, the Court will assume Peterich was a pretrial detainee because even under the arguably lesser Fourteenth Amendment standard, summary judgment is appropriate.

Traditionally, where a pretrial detainee plaintiff alleges inadequate medical care, courts in the Ninth Circuit have noted that a pretrial detainee's "rights under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment," so the same deliberate indifference standard applies.  *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).  The Ninth Circuit's test for deliberate indifference to a serious medical need in violation of the Eighth Amendment has two components.  *Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir. 2006).  First, the plaintiff must show a serious medical need by demonstrating that failure to treat a prisoner's condition could result in further significant injury or the unnecessary and wanton infliction of pain.  Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.  "This second prong . . . is satisfied by showing (a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference."  *Jett*, 439 F.3d

at 1096. Thus, in order to prevail, a plaintiff must show both that his medical needs were objectively serious, and that defendants possessed a sufficiently culpable state of mind. *Wilson v. Seiter*, 501 U.S. 294, 299 (1991); *McKinney v. Anderson*, 959 F.2d 853, 854 (9th Cir. 1992) (on remand). The requisite state of mind for a denial of medical claim under the Eighth Amendment is "deliberate indifference." *Hudson v. McMillian*, 503 U.S. 1, 5 (1992).

In 2015, however, the United States Supreme Court ruled that a pretrial detainee bringing a Fourteenth Amendment excessive force claim need only satisfy an objective standard. *Kingsley v. Hendrickson*, 135 S. Ct. 2466 (2015). In *Castro v. Cty. of Los Angeles*, 833 F.3d 1060, 1071 (9th Cir. 2016), the Ninth Circuit explained:

> the test to be applied under *Kingsley* must require a pretrial detainee who asserts a due process claim for failure to protect to prove more than negligence but less than subjective intent—something akin to reckless disregard.
>
> Putting these principles together, the elements of a pretrial detainee's Fourteenth Amendment failure-to-protect claim against an individual officer are:
>
> (1) The defendant made an intentional decision with respect to the conditions under which the plaintiff was confined;
> (2) Those conditions put the plaintiff at substantial risk of suffering serious harm;
> (3) The defendant did not take reasonable available measures to abate that risk, even though a reasonable officer in the circumstances would have appreciated the high degree of risk involved—making the

14

consequences of the defendant's conduct obvious; and
(4) By not taking such measures, the defendant caused the plaintiff's
injuries.

*Id.* at 1071.

While the Ninth Circuit has not specifically addressed the standard as it

applies to pretrial detainees' medical care claims, based on the Ninth Circuit's

observation in *Castro*, the Court assumes for purposes of this Order that the

objective deliberate indifference standard applies to pretrial detainees' denial of

medical care claims.

In applying the *Castro* test for denial of medical care claims, several district

courts have stated that a plaintiff is required to show that (1) the plaintiff made a

request for medical care; (2) the plaintiff had a serious medical need; (3) the

defendant did not take reasonable steps to obtain or provide medical care, even

though a reasonable officer (or reasonable medical staff) in the circumstances

would have appreciated the high degree of risk involved—making the likelihood of

harm obvious; and (4) by not taking such measures, the defendant caused the

plaintiff's injuries. *Guerra v. Sweeny*, 2016 WL 5404407, at *3 (E.D. Cal. Sept.

27, 2016).

Applying the *Castro* test to Peterich's claims, the Court finds that he failed

to demonstrate a genuine issue of material fact regarding whether Defendants were

objectively deliberately indifferent to his serious medical needs.

### 1. Defendant Johnson

Peterich's only claim against Defendant Johnson is that he failed to respond to Peterich's grievances, which impeded Peterich's medical treatment. (Doc. 68-1, 33:7-19.) The only grievance in the record is Peterich's August 20, 2015 grievance in which he complained his medical requests had gone unanswered, he needed a medical check up and surgery for his hernia, and his diet needed to be changed. (Doc. 68-11.) Peterich alleges, but fails to substantiate with evidentiary material, that Defendant Johnson was obligated to respond to grievances but threw the grievances away. Defendant Johnson, by contrast, has filed an affidavit stating that he was not required to respond to inmate grievances and that the protocol at BSBDC requires a response from a staff member who is able to appropriately respond to the grievance. (Doc. 71, ¶ 14, 15.) The grievance at issue here was responded to by Nurse Doherty after consultation with Dr. McGree. (Doc. 68-11.)

Assuming for purposes of this Order that Peterich made a medical request and that he had a serious medical need, he failed to present a genuine issue of material fact regarding whether Defendant Johnson took reasonable steps to obtain medical care. Peterich failed to demonstrate that Defendant Johnson's alleged failure to respond to his grievances impeded his medical treatment. The grievance

in question, which involved medical issues, was responded to by Nurse Doherty after consultation with Dr. McGree. Both determined that Peterich did not need additional medical care at that point. Peterich made no showing that he was entitled to additional medical care as a result of the August 20 grievance or that Defendant Johnson's failure to respond to the grievance impeded his medical treatment. Defendant Johnson should be granted summary judgment.

## 2. Defendant Williams

Peterich's only claim against Defendant Williams is that she impeded his medical treatment by answering Peterich's medical requests when she does not hold a medical degree. (Doc. 68-1, 36:3-6; Doc. 47 at 3.) Defendant Williams states, by way of affidavit, that BSBDC vested with authority to address medical requests and assist nurses in responding to such requests. (Doc. 70, ¶ 3.)

Peterich failed to sustain his burden to come forward with evidentiary materials establishing a genuine issue of material fact as to whether Defendant Williams acted with deliberate indifference to Peterich's medical needs. It is questionable whether Peterich was even suffering a serious medical need at the time of Defendant Williams' involvement. Defendant Williams responded to two medical requests in early August; but both medical requests were dated before the August 14, 2015 when Peterich first complained about his hernia. Defendant

Williams did not respond to any medical requests dealing with Peterich's hernia. Thus, Defendant Williams cannot have impeded Peterich's medical treatment for his hernia by responding to medical requests. As to his other claimed medical needs which he claims were ignored, Peterich has conceded his claims related to dietary needs are spurious because he never had colon cancer or underwent chemotherapy, and his claims for a no-milk diet were mostly to get a substitute meal with more food. (Doc. 68-1, 122:19-123:19, 276:7-10.)

Finally, Defendant Williams was entitled to rely on the medical response from the nurse in providing a response to Peterich. Courts have held that non-medical personnel are entitled to rely on the opinions and determinations of medical personnel pertaining to the medical treatment of inmates. *Caplinger v. CCA*, 999 F. Supp. 2d 1203, 1214 (D. Idaho 2014). As one court put it, non-medical staff may defer to the judgment of medical staff as long as they do not ignore the inmate. *Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010). "The only exception to this rule is that nonmedical officers may be found deliberately indifferent if 'they have a reason to believe (or actual knowledge) that prison doctors or their assistants are mistreating (or not treating) a prisoner.'" *King v. Kramer*, 680 F.3d 1013, 1018 (7th Cir. 2012) (quoting *Hayes v. Snyder*, 546 F.3d 516, 527 (7th Cir. 2008) (citations and internal quotations omitted). In view of

*Kingsley*, the test for this exception should ask whether a reasonable person would have reason to believe or know the doctors or assistants are mistreating or failing to treat a pretrial detainee. Since Peterich has made no showing that he was mistreated by medical staff, Defendant Williams was entitled to rely upon the judgment of BSBDC's nurses regarding Peterich's medical needs.

Because Peterich's dietary claims are no longer viable, Defendant Williams did not respond to a medical request that involved medical treatment for his hernia, and because she was entitled to rely on the nurses' response, Defendant Williams should be granted summary judgment.

### 3. Dr. McGree

Dr. McGree has demonstrated the lack of a genuine issue of material fact as to whether he recklessly disregarded Peterich's medical needs. Dr. McGree reviewed Peterich's medical records, discussed Peterich's medical condition with the nurse who had previously examined Peterich, and later examined Peterich himself. After these actions, Dr. McGree opined that Peterich's hernia was benign and Peterich was medically stable. He later stated his opinion that at all times during Peterich's second stay at BSBDC, Peterich's hernia was not incarcerated and was easily reducible. (Doc. 69, ¶ 24.) In his declaration, Dr. McGree explained that a reducible hernia that is not incarcerated is not a medical

emergency and does not require surgery.  He stated it was within the standard of care to not intervene in this situation, but rather to continue to monitor the person until the condition changed.  (*Id.* ¶ 23.)  Peterich submitted no evidence suggesting that a reducible, non-incarcerated hernia is a medical emergency requiring surgery.

Peterich conceded that Dr. McGree took all actions he could and any failure to get Peterich surgery for his hernia while at BSBDC stems from a difference in medical opinion.  First, Peterich admitted that as a DOC inmate any surgery for his hernia had to be approved by the DOC, not Dr. McGree.  (Doc. 68-1, 221:19-222:9.)[5]  Peterich also understood that Dr. McGree sent the surgery referral, which was all he could do in this case.  (*Id.* at 222:22-223:1.)  When the surgery referral was denied, Dr. McGree had no ability to overrule the denial.  (Doc. 69, ¶ 7.)  In addition to understanding Dr. McGree's limited ability to take action, Peterich acknowledged that most hernia surgeries are elective and an operation is not medically necessary.  (Doc. 76-3, 277:8-15.)

Despite this, Peterich still argues he required surgery for his hernia while at BSBDC.  He bases this argument upon the alleged facts that when other jail and medical staff saw Peterich's condition, they stated he needed to have hernia

---

[5]Although Peterich's status as a pretrial detainee or convicted prisoner at his time of injury is an issue, by the September 15 examination Peterich had been sentenced by two separate judges to a DOC commitment.  As a DOC inmate, any surgery had to be approved by the DOC.  (Doc. 68, ¶ 51, 53.)

surgery immediately. (Doc. 47, at 4; Doc. 76-2, 151:1-152:22.) In essence, Peterich argues Dr. McGree's his medical opinion should have been different because other people allegedly had the opinion Peterich needed hernia surgery immediately. Even if Peterich presented evidence from other medical professionals regarding his hernia, a difference of opinion between an inmate and prison medical personnel—or between medical professionals—regarding appropriate medical diagnosis and treatment is not enough to establish a deliberate indifference claim. *Sanchez v. Vild*, 891 F.2d 240, 242 (9th Cir. 1989); *Toguchi v. Chung*, 391 F.3d 1051, 1058 (9th Cir. 2004).

Furthermore, documents produced by the defense support Dr. McGree's medical opinion that Peterich did not require immediate surgery for his hernia. On November 13, 2015, upon Peterich's transfer to MASC, the medical assessment form for Peterich lists an inguinal hernia that reduces easily. Far from requiring immediate attention, the examiner noted "just wants us to know." (Doc. 68-21.) It was not until January 6, 2016, that medical personnel noted that Peterich's hernia is "not going back in." (Doc. 68-22.) Peterich did not receive surgery for his hernia until about a month later. (Doc. 68, ¶ 75.) Almost three months elapsed between Peterich leaving BSBDC and receiving hernia surgery, which implies that other medical staff did not have the opinion that Peterich's hernia needed to be

operated on immediately; Peterich failed to submit evidence rebutting this.

Dr. McGree established that he did not recklessly disregard Peterich's medical needs. Dr. McGree examined Peterich and found his medical condition to be stable and his hernia to be benign. Despite this, Dr. McGree sent a surgery referral to the DOC, which was denied. Furthermore, Peterich's belief that he should have had his hernia operated on sooner stems only from allegations Peterich has made about other people's medical opinions. Peterich has not supported this contention, and even if he had, he has only shown a difference of medical opinion, which not does amount to deliberate indifference. Dr. McGree is entitled to summary judgment.

### D. Fourteenth Amendment Equal Protection Claim

In his Complaint, Peterich alleges a violation of his Fourteenth Amendment equal protection rights. (Doc. 1.) Peterich failed to allege any facts which support an Equal Protection Claim against Defendants.

The Equal Protection Clause requires the government to treat similarly situated people alike. *City of Cleburne, TX. v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985). To plead an equal protection claim, a plaintiff must show "that the defendants acted with an intent or purpose to discriminate against the plaintiff based upon membership in a protected class." *Barren v. Harrington*, 152 F.3d

1193, 1194 (9th Cir. 1998). "The first step in equal protection analysis is to identify the [defendant's] classification of groups." *Country Classic Dairies, Inc. v. Montana, Dep't of Commerce Milk Control Bureau*, 847 F.2d 593, 596 (9th Cir. 1988).

Peterich alleged no facts upon which this Court can infer a classification has been made nor has Peterich stated that he was treated differently than other similarly situated persons based upon that classification. Peterich's Complaint is silent as to a classification of a group or treatment which is different from similarly situated persons. (Doc. 1.) In his initial disclosure statement, Peterich again alleged a violation of his equal protection rights specifically against Dr. McGree, stating his rights were violated because his medical needs were not treated. (Doc. 47 at 5.) During Peterich's deposition, defense counsel asked for Peterich to elaborate on his equal protection claim. Peterich responded initially that all BSBDC inmates were treated poorly: "The way they treated us as in a whole, everybody that's incarcerated there, is wrong. They didn't want to do anything for anybody." (Doc. 76-1, 39:19-21.) Defense counsel inquired whether Peterich felt he was treated differently due to his race, gender, or religion; Peterich responded in the negative to each question. (*Id.* at 41:13-23.) Peterich did say he, as an individual, was treated differently because Defendant Williams allegedly did not

like Peterich.  (*Id.* at 41:23-25.)  He also said he was treated unfairly because he did not have fair medical treatment.  (*Id.* at 40:22-25.)

Beyond Peterich's pleadings and statements during the deposition, he failed to submit any evidence regarding his Fourteenth Amendment equal protection claim.  While the Court offers leniency to pro se litigants, it cannot allow a pro se litigant to prolong litigation on a claim where there is a complete lack of evidence.  Though Peterich alleges he was treated differently, he offered no proof beyond self-serving statements.  Since Peterich offered no evidence of a classification of a group or how he was treated differently from similarly situated persons, his Fourteenth Amendment equal protection claim fails as a matter of law.

### E.     Medical Malpractice Claim

Although Peterich did not claim medical malpractice in his Complaint, Dr. McGree moved for summary judgment to the extent the Court might construe Peterich's pleadings to assert a state medical malpractice claim.[6]  Out of an abundance of caution, the Court will address such a claim.  Peterich failed to submit any expert medical testimony or disclose any expert regarding the medical treatment he received.  As such, the Court should grant summary judgment on any construed medical malpractice claim.

---

[6]In his disclosure statement, Peterich accuses Dr. McGree of negligence.  (Doc. 47 at 2, 3.)

24

The Montana Supreme Court is clear about the requirements of a medical malpractice claim:

> It is well settled Montana law that the plaintiff in a medical malpractice action must establish the following elements: (1) the applicable standard of care, (2) the defendant departed from that standard of care, and (3) the departure proximately caused plaintiff's injury. Without expert testimony to establish these elements, no genuine issue of material fact exists and the defendant is entitled to judgment as a matter of law.

*Estate of Willson v. Addison*, 258 P.3d 410, 414 (Mont. 2011) (citations omitted).

Expert medical testimony is a necessity "'unless the conduct complained of is readily ascertainable by a layman.'" *Montana Deaconess Hosp. v. Gratton*, 545 P.2d 670, 672 (Mont. 1976) (quoting *Evans v. Bernhard*, 533 P.2d 721, 724 (Ariz. 1975)).

The treatment of diverticulitis and/or the decision to operate on a hernia are not decisions that are not readily ascertainable by a layman. Therefore, to defeat a motion for summary judgment, Peterich must establish through expert testimony the standard of care, the departure from the standard of care, and causation of his injury. Peterich has not filed any expert testimony through pleadings, affidavits, or other such documents. Nor has Peterich disclosed any experts expected to testify on a medical malpractice claim. In the absence of expert medical testimony, no genuine issue of material fact exists, and summary judgment is appropriate.

Based upon the foregoing, the Court issues the following:

## RECOMMENDATIONS

1.  Defendants' Motions for Summary Judgment (Docs. 66, 74) should be GRANTED and this matter DISMISSED.  The Clerk of Court should be directed to close the case and enter judgment in favor of Defendants pursuant to Rule 58 of the Federal Rules of Civil Procedure.

2.  The Clerk of Court should be directed to have the docket reflect that the Court certifies pursuant to Rule 24(a)(3)(A) of the Federal Rules of Appellate Procedure that any appeal of this decision would not be taken in good faith.  No reasonable person could suppose an appeal would have merit.

### NOTICE OF RIGHT TO OBJECT TO FINDINGS & RECOMMENDATIONS AND CONSEQUENCES OF FAILURE TO OBJECT

The parties may file objections to these Findings and Recommendations within fourteen (14) days after service (mailing) hereof.[7]  28 U.S.C. § 636.  Failure to timely file written objections may bar a de novo determination by the district judge and/or waive the right to appeal.

This order is not immediately appealable to the Ninth Circuit Court of Appeals.  Any notice of appeal pursuant to Fed.R.App.P. 4(a), should not be filed

---

[7]As this deadline allows a party to act after the Findings and Recommendations is "served," it falls under Fed.R.Civ.P. 6(d).  Therefore, three (3) days are added after the period would otherwise expire.

until entry of the District Court's final judgment.

DATED this _24th_ day of March, 2017.

Jeremiah C. Lynch
United States Magistrate